**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| 9878866 CANADA INC., | ) |
|  | ) |
| Plaintiff, | ) |
| Counter-Defendant, | ) |
|  | ) |
| v. | )   Civil Action No. 25-2443 (RBW) |
|  | ) |
| INTAKE BREATHING | ) |
| TECHNOLOGY, LLC, | ) |
|  | ) |
| Defendant, | ) |
| Counter-Plaintiff. | ) |
|  | ) |

<u>**MEMORANDUM OPINION**</u>

The parties in this case both sell competing disposable nasal adhesive products designed

to be used with a magnetic nasal strip to help users of the nasal device breathe better.  The

plaintiff/counter-defendant, 9878866 Canada Inc. (hereinafter referred to as the "plaintiff" or

"Pl."), does not hold a patent for the nasal adhesive product that it sells, but the

defendant/counter-plaintiff, Intake Breathing Technology, LLC (hereinafter referred to as the

"defendant" or "Def.") does.  Although the plaintiff does not hold a patent for the disposable

nasal product it sells, it initiated this civil action against the defendant alleging "unfair

competition, and false and misleading advertising under Section 43 of the Lanham Act, 15

U.S.C. § 1125, related unfair or deceptive trade practices under District of Columbia Code § 28-

3904, and [seeks a] Declaratory Judgment of patent non[-]infringement and invalidity against

[the] Defendant. . . ."  <u>See</u> First Amended Complaint ("Am. Compl.") at 1, ECF No. 10.  The

defendant filed its answer in response to the plaintiff's Amended Complaint, in which it asserts

several affirmative defenses and counterclaims.  <u>See generally</u> Answer To Plaintiff's First

Amended Complaint, Affirmative Defenses, And Counterclaims ("Answer"), ECF No. 16. Among the defendant's counterclaims, and important to the current matter before the Court, the defendant has filed patent infringement claims pursuant to 35 U.S.C. §§ 101, 271, 281, and 284, in which it alleges that the plaintiff is infringing its U.S. Patent No. 9,510,969, entitled "Nasal Element for a Breathing System" (hereinafter referred to as the "defendant's patent"). Id. at 11–12; Am. Compl., Exhibit ("Ex.") A (U.S. Patent No. 9,510,969 B2 (filed Dec. 6, 2016) ("the defendant's patent")) at 2, ECF No. 10-1.[1] Accordingly, immediately after filing its answer, the defendant moved for a preliminary injunction pursuant to 35 U.S.C. § 283 and Federal Rule of Civil Procedure 65, requesting that the Court enjoin the plaintiff "from offering for sale, selling, importing, [and/or] using, . . . its infringing 'Intake Breathing' products during the pendency of" this case. See Defendant Intake Breathing Technology, LLC's Motion for Preliminary Injunction ("Def.'s PI Mot.") at 1, ECF No. 17. Upon careful consideration of the parties' submissions,[2] the Court concludes for the following reasons that it must grant the defendant's motion.

---

[1] Unless otherwise indicated, all pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appear at the top of each page of the documents that comprise the record in this case.

[2] In addition to the filings already identified, the Court considered the:  (1) Am. Compl., Ex. B (Product Page for Nasal Strips Refill Pack – 30-Day Count – Enhanced Breathing, Sleep Aid & Snore Reduction, Bash Stack), ECF No. 10-2; (2) Am. Compl., Ex. D (Intake Breathing Technology, www.intakebreathing.com (July 28, 2025, 7:08 PM) ("Intake's website")), ECF No. 10-4; (3) Answer, Ex. 1 (U.S. Patent No. 9,510,969 B2 (filed Dec. 6, 2016) (the defendant's patent")), ECF No. 16-1; (4) Def.'s PI Mot., Declaration Of Chris Herbert In Support Of Defendant's Motion For A Preliminary Injunction ("Herbert Decl."), ECF No. 17-1; (5) Def.'s PI Mot., Declaration of Dawn M. David ("David Decl."), ECF No. 17-2; (6) Def.'s PI Mot., Ex. A to the David Decl. (Intake Breathing Technology, www.intakebreathing.com (Sept. 16, 2025)), ECF No. 17-3; (7) Def.'s PI Mot., Ex. B to the David Decl. (Amazon Product Page for Nasal Strips Refill Pack – 30-Day Count – Enhanced Breathing, Sleep Aid & Snore Reduction, Bash Stack), ECF No. 17-4; (8) Def.'s PI Mot., Ex. C to the David Decl. (1-star Amazon Reviews for Nasal Strips Refill Pack – 30-Day Count – Enhanced Breathing, Sleep Aid & Snore Reduction, Bash Stack), ECF No. 17-5; (9) Def.'s PI Mot., Ex. D to the David Decl. (Amazon Complaint Submission History), ECF No. 17-6; (10) Def.'s PI Mot., Ex. E to the David Decl. (Bash Stack Baby Trademark Application), ECF No. 17-7; (11) the Plaintiff's Memorandum In Opposition To Defendant's Motion For Preliminary Injunction ("Pl.'s Opp'n") at 1, ECF No. 21; (12) Pl.'s Opp'n, Declaration Of Marie Habib In Support Of Plaintiff's Opposition To Defendant's Motion For Preliminary Injunction ("Habib Decl."), ECF No. 21-2; (13) Pl.'s Opp'n, Declaration Of Seth A. Watkins In Support
(continued . . .)

## I.    BACKGROUND

### A.    Factual Background

The defendant holds a patent for its "magnetic nasal strip medical device" that functions as a "nasal breathing aid[]" for its users.  Def.'s PI Mot. at 10.[3]  The defendant sells its patented device "through its website [ ], on e-commerce platforms such as Amazon.com and TikTok, and through a select number of authorized distributors."  Answer at 15 ¶ 18.  The medical device consists of "a magnetic nasal band and refill tabs [that are] required for the band's use."  Def.'s PI Mot. at 9.  An image of the defendant's medical device, as shown in the defendant's patent specification, along with a separate picture of the refill tabs is depicted below.

---

(. . . continued)
Of Plaintiff's Opposition To Defendant's Motion For Preliminary Injunction ("Watkins Decl."), ECF No. 21-5; (14) Pl.'s Opp'n, Ex. 4 to Watkins Decl. (United States Patent No. 7,793,661 B2 (filed Sept. 14, 2010) ("Macken Patent")), ECF No. 21-9; (15) Pl.'s Opp'n, Ex. 5 to Watkins Decl. (United States Patent Application Publication No. U.S. 2005/0139215 A1 (filed June 30, 2005) ("Riach Application")), ECF No. 21-10; (16) Pl.'s Opp'n, Ex. 6 to Watkins Decl. (United States Patent and Trademark Office Action Summary Application No. 14/628,517 (Apr. 25, 2016)), ECF No. 21-11; (17) Pl.'s Opp'n, Ex. 7 to Watkins Decl. (Applicant's Amendment in Response to Office Action of April 25, 2016 ("Response to Office Action Summary")), ECF No. 21-12; (18) Pl.'s Opp'n, Ex. 8 to Watkins Decl. (United States Patent and Trademark Office Notice Of Allowance And Fee(s) Due Application No. 14/628,517 (Aug. 23, 2016) ("Notice of Allowance")), ECF No. 21-13; (19) Intake's Reply Memorandum In Support Of Its Motion For Preliminary Injunction ("Def.'s Reply") at 1, ECF No. 24; (20) Joint Statement In Response To The Court's Order For Briefing On Personal Jurisdiction ("Personal Jurisdiction Joint Statement"), ECF No. 34; (21) the defendant's Notice Of Supplemental Authority And Facts, ECF No. 35; and (22) the oral arguments of the parties during the motion hearing held on October 3, 2025.

[3] The defendant's patent describes that its invention relates "specifically to an eyewear accessory kit designed to enhance nasal airflow for the wearer by urging the wearer's nostrils to a more open position."  Am. Compl., Ex. A (the defendant's patent) at 11.  During the motions hearing conducted by the Court, the defendant explained that the invention "was originally developed for dirt bike riders."  Motion Hearing Transcript ("Hr'g Tr.") 29:20–21.  "According to one embodiment[ in the specification of the patent,] an eyewear system [is] adapted to open a nasal passage of a user."  Am. Compl., Ex. A (the defendant's patent) at 11.

> The eyewear system includes a wearable frame [that has] a bridge section configured to be placeable adjacent the nose of the user. A nasal attachment member is configured to be selectively placeable on the nose of the user adjacent the nasal passage. The nasal attachment member is adapted to be urged toward the wearable frame in response to placement of the wearable frame adjacent the nose of the user to cause the nasal passage of the user to open.

Id.  Moreover, the specification provides that the descriptions and drawings included in the specification were not included to limit the embodiments of the invention, but were included to "illustrat[e] a preferred embodiment of the [ ] invention only."  Id.  The specification therefore states "that the same or equivalent structure and/or functions may be accomplished by different embodiments that are also intended to be encompassed within the scope of the" specification.  Id.

3



*Fig. 16*

Am. Compl., Ex. A (the defendant's patent) at 8, fig. 16.



Am. Compl., Ex. D (Intake's website) at 20.

The "nasal band [is] intended to be used repeatedly with the aid of [the defendant's] [r]efill [t]abs, which customers must replenish regularly to continue using the nasal band." Def.'s PI Mot. at 11.  Claim 1 of the defendant's patent—which is at the crux of the dispute between the parties—describes the defendant's refill tabs and states the following:

> What is claimed is:
> 1. A disposable apparatus attachable to a nose of a wearer and configured for use with a magnet positioned adjacent to the nose of the wearer, the disposable apparatus comprising:
>
> a flexible base layer including a first surface and an opposing second surface, the first surface having an adhesive disposed thereon to enable the first surface to be selectively attachable to the nose of the wearer;

4

a metallic element coupled to the second surface of the base layer and being configured to interact with the magnet when the magnet is positioned adjacent the nose of the wearer and the flexible base layer is attached to the nose of the wearer, the interaction between the metallic element and the magnet imparting a dilating force on the nose of the wearer causing the nose of the wearer to dilate; and

an outer layer coupled to the base layer and extending over the metallic element to at least partially cover the metallic element;

at least a portion of the flexible base layer extending radially outward beyond the metallic element to define a flexible peripheral portion;

the metallic element being configured to allow for movement of the magnet relative to the metallic element when the magnet is magnetically engaged with the metallic element;

the disposable apparatus, while being attached to the nose of the wearer, being selectively transitional between an active state and an inactive state, in the active state, the metallic element magnetically interacts with the magnet to impart the dilating force on the nose of the wearer, in the inactive state, the metallic element is magnetically decoupled from the magnet to cease imparting of the dilating force on the nose of the wearer.

Answer, Ex. 1 (the defendant's patent) at 15. There are also 29 other claims in the defendant's patent. Id. Importantly, claims 2–18 of the defendant's patent depend on claim 1 in their respective descriptions. For example, claim 2 states "[t]he disposable apparatus recited in claim 1, wherein the metallic element is configured to impart the dilating force only in response to interaction between the metallic element and the magnet." Id. at 15. Therefore, if claim 1 of the defendant's patent is invalid, then the other claims which rely on claim 1 are also invalid.

Additionally, to maintain the device's "effective[ness]" and "high quality," the defendant "does not license" its patent. Def.'s PI Mot. at 11. Instead, the defendant "encourages repeat purchases in part by offering discounted prices on its [r]efill [t]abs to return customers who become subscribers" of the defendant's product. Id. The defendant claims that "demand and

popularity have been growing for [its] products" and that its products have gone "viral over social media."  Id.

The plaintiff sells a product "under the branding Bash Stack, [which it identifies as] a 'Nasal Strips Refill Pack – 30-Day Count – Enhanced Breathing, Sleep Aid & Snore Reduction, Bash Stack'" (hereinafter referred to as the "Accused Product") on Amazon.com (hereinafter referred to as "Amazon").  Am. Compl. ¶ 3.  Specifically, the Accused Product is "30 pairs of patches" that are "thin adhesive patch[es] with a metal disc that attaches to a magnetic nasal band."  Id. ¶ 4 (internal brackets omitted).  Users of the Accused Product place one of the patches "to either side of [the user's] nose."  Id. ¶ 5.  Importantly, a "magnetic nasal band and applicator are not included with the Accused Product."  Id. (citation modified).  Images of the Accused Product are depicted below:



Id.

On July 7, 2025, Amazon's patent evaluation team sent the plaintiff an email notifying it that Amazon "received a report from [the defendant] who believes the" Accused Product "infringe[s] [the defendant's patent]."  Id. ¶ 6.  Amazon notified the plaintiff that, because the

Accused Product was reported to Amazon as a product believed to be infringing a patent, the plaintiff had three choices if the plaintiff wished to continue selling the Accused Product on Amazon.  Id.[4]  The first choice was to contact the defendant "within . . . three weeks" of Amazon's July 7, 2025, email "to resolve [the] claim."  Id.  And, if the defendant agreed to retract its claim, the plaintiff could continue to sell the Accused Product on Amazon.  Id.  The second option the plaintiff had was "to resolve the claim with the patent owner in a federal district court case."  Id.  If the plaintiff "file[d] a lawsuit against the [defendant] for [a] declaratory judgment of non-infringement . . . within the [ ] three weeks [thereafter], [the plaintiff could] continue selling the [Accused Product] while the lawsuit proceed[ed]."  Id.  The third option the plaintiff was given was to "participate in neutral evaluation of the patent owner's claim" under "Amazon's neutral evaluation procedure[,]" also called the "Amazon Patent Evaluation Express" ("APEX").[5]  Id. at ¶¶ 6, 7.  Amazon explained to the plaintiff that "participation in the evaluation process does not guarantee that [the plaintiff] will be able to continue to sell the [Accused Product] . . . [i]f the evaluator decides that the items likely infringe" the defendant's patent.  Id. ¶ 6.  But, if the plaintiff did "not either resolve [the] claim with the patent owner directly, or agree to participate in [Amazon's] neutral evaluation process, [Amazon would] remove the [Accused Product] . . . from Amazon."  Id.

After receiving the July 7, 2025, email from Amazon with these options, the plaintiff contacted the defendant ten days later on July 17, 2025, "to arrange discussions concerning the [defendant's] infringement allegation made to Amazon[]."  Id. ¶ 8.  Subsequently, the parties

---

[4] The email the plaintiff received from Amazon actually indicated that the plaintiff had two choices because although it informed the plaintiff of the option to file a lawsuit, it did not specifically identify this course of action as a separate option.

[5] "APEX is [a] voluntary, confidential" patent evaluation process provided by Amazon that "allows owners of U.S. utility patents or their authorized representatives, such as attorneys or exclusive licensees to obtain a fast evaluation of patent infringement claims against products" by "a neutral evaluator."  Am. Compl. ¶ 7.

engaged in discussions on three different days in an attempt to resolve the dispute.  Id.  Despite

these discussions, the defendant "declined to retract [its] infringement allegation" made to

Amazon.  Id.  The defendant also "declined" any "further . . . resolution [of its infringement

allegation] other than the cessation of" the plaintiff selling the Accused Product.  Id.

###    B.    Procedural History

On July 28, 2025, the plaintiff filed its Complaint, see generally Complaint for

Declaratory Judgment of Noninfringement, at 1, ECF No. 1, and on September 5, 2025, filed an

Amended Complaint, see generally Am. Compl. at 1.  The defendant filed its answer to the

plaintiff's Amended Complaint on September 19, 2025, which asserted affirmative defenses and

counterclaims.  See generally Answer.  On the same day, the defendant also filed its motion for a

preliminary injunction.  See generally Def.'s PI Mot. at 1.

On September 24, 2025, the Court ordered the plaintiff to respond to the defendant's

preliminary injunction motion "on or before September 26, 2025," and ordered the defendant to

reply to the plaintiff's opposition on or before October 1, 2025.  See Order at 1 (Sept. 24, 2025),

ECF No. 20.  Subsequently, on September 27, 2025, the plaintiff filed its opposition to the

defendant's motion for a preliminary injunction, see generally Pl.'s Opp'n at 1, and on

September 30, 2025, moved for "leave to file its Opposition . . . one (1) day out of time," see

Corrected Plaintiff's Unopposed Motion For Leave To File Out Of Time Its Opposition To

Defendant's Motion For Preliminary Injunction ("Pl.'s Mot. for Leave"), at 1–2, ECF No. 23,

which the Court granted on October 3, 2025, see Minute ("Min.") Order (Oct. 3, 2025).  On

October 1, 2025, the defendant filed its reply to the plaintiff's opposition brief.  See generally

Def.'s Reply at 1.  After briefing was complete, the Court held a hearing on the defendant's

motion for a preliminary injunction.  See Min. Entry (Oct. 3, 2025).

8

## II.   STANDARD OF REVIEW[6]

In deciding whether a preliminary injunction should issue in this patent dispute, the Court applies the law of the D.C. Circuit.  See Trebro Mfg., Inc. v. Firefly Equip., LLC, 748 F.3d 1159, 1165 (Fed. Cir. 2013) ("The grant[ or] denial . . . of a preliminary injunction is not unique to patent law, so [district] court[s] appl[y] the law of the regional circuit when [deciding] such a decision.") (internal ellipses omitted).  However, since "the Federal Circuit has [ ] built a body of precedent applying the general preliminary injunction considerations to a large number of factually variant patent cases," courts may give "effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues."  Id. (internal brackets omitted).

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  Instead, courts are required to "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  Id. (citing Amoco Prod. Co. v. Village of Gambell, 480

---

[6] The Court has subject matter jurisdiction to review this case pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, because the parties dispute "depends on resolution of a substantial question of federal patent law." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 808–09 (1988).

On October 24, 2025, the Court ordered the parties to provide further briefing and show cause why the Court has personal jurisdiction to entertain both the defendant's counterclaims and the plaintiff's claims. See Order at 1 (Oct. 24, 2025), ECF No. 32.  On October 29, 2025, the parties filed their Personal Jurisdiction Joint Statement in which the plaintiff stated "that it has voluntarily consented to personal jurisdiction of this Court in this action by filing" its Complaint and First Amended Complaint in this Court.  Personal Jurisdiction Joint Statement at 1; see Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 451 (1932) (explaining that when a party brings a suit in federal district court, "it submit[s] itself to the jurisdiction of the [C]ourt with respect to all the issues embraced in the suit, including those pertaining to the counterclaim of the defendants").  Likewise, the defendant "elected to waive its objections to personal jurisdiction" and instead file its counterclaims for the Court to decide on the merits.  Personal Jurisdiction Joint Statement at 2.

Therefore, because "personal jurisdiction . . . can be waived at any stage of a proceeding[,]" Spann v. Colonial Vill., Inc., 899 F.2d 24, 32–33 (D.C. Cir. 1990), the Court has personal jurisdiction over the defendant's patent infringement claim presently before the Court.  See Rates Tech. Inc. v. Nortel Networks Corp., 399 F.3d 1302, 1307 (Fed. Cir. 2005) (internal quotations omitted) (quoting Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived.")).

9

U.S. 531, 542 (1987)).  Parties in a patent dispute, like parties in any type of case, "seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."  Id. at 20.  These factors are referred to as the "Winter factors."  See, e.g., Global Health Council v. Trump, 153 F.4th 1, 12 (D.C. Cir. 2025) (referring to the factors courts weigh in deciding whether to issue a preliminary injunction as the "Winter factors").  "[I]t remains an open question [in this Circuit] whether the 'likelihood of success' factor is 'an independent, free-standing requirement,' or whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits."  Id. (quoting Aamer v. Obama, 742 F.3d 1023, 1043 (D.C. Cir. 2014)).  But, where a party has not shown that it is likely to succeed on the merits, and the other three Winter factors do not "strongly favor" the issuance of an injunction, a preliminary injunction should not issue.  Id. (holding that "the district court abused its discretion in granting a preliminary injunction" in a case where the movant "failed to show they are likely to succeed on the merits and the other Winter factors [did] not 'strongly favor' the issuance of an injunction").

### III.    ANALYSIS

The defendant contends that the Court should grant its motion for a preliminary injunction because:  (1) it is highly likely to succeed on the merits, see Def.'s PI Mot. at 14; (2) it will suffer irreparable harm in the absence of an injunction, see id. at 29; (3) the balance of the equities sharply favors the defendant, see id. at 37; and (4) an injunction is in the public interest, see id. at 38.  The Court will address each preliminary injunction factor in turn.

10

**A.      Likelihood of Success on the Merits**

In deciding whether a movant has established that it is likely to succeed on the merits at the preliminary injunction stage of a patent infringement case, the patentee "must show that it will likely prove infringement, and that it will likely withstand challenges . . . to the validity of the patent."  Tinnus Enter., LLC v. Telebrands Corp., 846 F.3d 1190, 1202 (Fed. Cir. 2017); see BlephEx, LLC v. Myco Indus., Inc., 24 F.4th 1391, 1398–99 (Fed. Cir. 2022) (citing Entegris, Inc. v. Pall Corp., 490 F.3d 1340, 1351 (Fed. Cir. 2007) (explaining that a "patent holder seeking a preliminary injunction bears the burden of establishing a likelihood of success on the merits with respect to the patent's validity").  To counter a patentee's position, the "accused infringer 'can defeat a showing of likelihood of success on the merits by demonstrating a substantial question of validity or infringement.'"  Tinnus Enter., LLC, 846 F.3d at 1202 (quoting Trebro Mfg., Inc., 748 F.3d at 1165).  The accused infringer "bears the initial burden 'to come forward with evidence of invalidity[.]'"  BlephEx, LLC, 24 F.4th at 1399 (quoting Titan Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1376 (Fed. Cir. 2009)).  If the accused infringer provides such evidence, the Court will then "consider 'the evidence on both sides of the validity issue' to determine if the [accused] infringer has raised a substantial question of validity."  Id. (quoting Titan Tire Corp., 566 F.3d at 1379).  To raise a substantial question of validity, the accused infringer "need only assert a defense that the [patentee] cannot show lacks substantial merit."  Id. (internal brackets and quotations omitted).  If an accused infringer makes this showing, "the preliminary injunction should not issue."  Id.

**1.      Whether the Accused Product Infringes Any Claim in the Defendant's Patent**

The defendant first contends that the plaintiff's "product is a clear infringement of not just one, but many claims of the" defendant's patent.  Def.'s PI Mot. at 14.  The defendant asks

11

the Court to compare independent claim 1 of the defendant's patent with the Accused Product because, according to the defendant, the Accused Product "include[s] each and every aspect of representative claim 1." Id. at 15, 22–23 (arguing that "[b]ecause subsequent claims 2–5 and 8–18 are dependent claims which merely recite additional features of independent claim 1, claim 1 is representative for the infringement analysis."). The plaintiff disagrees with the defendant, arguing that its Accused Product "does not include each feature of independent claim 1 of the [defendant's] patent[,]" and therefore "cannot be found to infringe . . . dependent claims 2–5 and 8–18[.]" Pl.'s Opp'n at 33. Accordingly, the Court will assess whether the defendant is likely to succeed on the merits of its argument that the plaintiff is infringing claim 1 of its patent because, if so, the plaintiff would also be infringing not only claims 2–5 and 8–18, but also claims 6 and 7.[7]

35 U.S.C. § 271 prohibits the infringement of a patent.[8] The "claims" in a patent "measure the invention." Brumfiel, Tr. for Ascent Tr. v. IBG LLC, 97 F.4th 854, 879 (Fed. Cir. 2024) (citing Cont'l Paper Bag Co. v. E. Paper Bag Co., 210 U.S. 405, 419 (1908)). Thus, "each element contained in a patent claim is deemed material to defining the scope of the patent invention, and a patentee's rights extend only to the claimed combination of elements, and no further." Id. (citation modified) (citing Limelight Networks, Inc. v. Akamai Techs., Inc., 572 U.S. 915, 921 (2014)).

---

[7] Claims 6 and 7 in the defendant's patent also refer to claim 1, the Court therefore includes claims 6 and 7 here because if the defendant is not likely to succeed on the merits in showing that the plaintiff is infringing claim 1, it follows that the defendant would likely not succeed on the merits in showing that the plaintiff is infringing claims 6 and 7.

[8] 35 U.S.C. § 271(a) provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor[e], infringes the patent."

12

An "infringement and validity analyses must be performed on a claim-by-claim basis." Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1351 (Fed. Cir. 2001). "[I]n cases involving multiple patent claims, . . . the patentee must demonstrate that it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer." Id. Whether an accused product infringes a patent is a question of fact that involves a two-step process. See, e.g., Tinnus Enter., LLC, 846 F.3d at 1203; Amazon.com, Inc., 239 F.3d at 1351. The Court's first step is to "constru[e] the claims" of the patent, and the second step is to "compar[e] the properly construed claims to the accused product." Tinnus Enter., LLC, 846 F.3d at 1203 (citing Advanced Steel Recovery, LLC v. X-Body Equip., Inc., 808 F.3d 1313, 1316 (Fed. Cir. 2015)).

In construing claim 1 of the defendant's patent, the Court will accord the terms of the claim "their ordinary and customary meaning [based on] a person having ordinary skill in the art at the time of the effective date of the patent application." Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1217 (Fed. Cir. 2014). "To ascertain the scope and meaning of . . . claim[ 1], [the Court] look[s] to the words of the claim[ itself], the specification, the prosecution history, and any relevant extrinsic evidence." Id. at 1217–18. However, the specification[9] "is the single best guide to the meaning of a disputed term[,]" and is usually dispositive. Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir. 2005).

To reiterate, claim 1 of the defendant's patent states the following:

---

[9] "The function of a patent specification is twofold: (1) to explain and describe the invention in such terms that any person skilled in the art to which it appertains may make and use it after the expiration of the term of the patent; and (2) to inform the public during the life of the patent of the limits of the monopoly asserted." John Gladstone Mills III et al., 4 Patent Law Fundamentals § 13:17 (2d ed. 2009). "As used in the Patent Act, the term 'specification' is clearly inclusive of the claims. In practice, however, the term 'specification' is often used to connote the descriptive part of the specification which precedes the claims." Id.

1. A disposable apparatus attachable to a nose of a wearer and configured for use with **a magnet positioned adjacent to the nose of the wearer**, the disposable apparatus comprising:

a flexible base layer including a first surface and an opposing second surface, the first surface having an adhesive **disposed thereon** to enable the first surface to be selectively attachable to the nose of the wearer;

a metallic element coupled to the second surface of the base layer and being configured **to interact with the magnet when the magnet is positioned adjacent the nose of the wearer** and the flexible base layer is attached to the nose of the wearer, the interaction between the metallic element and the magnet imparting a dilating force on the nose of the wearer causing the nose of the wearer to dilate; and

**an outer layer coupled to the base layer and extending over the metallic element to at least partially cover the metallic element**;

at least a portion of the flexible base layer extending radially outward beyond the metallic element to define a flexible peripheral portion;

the metallic element being configured to allow for movement of **the magnet** relative to the metallic element when the magnet is magnetically engaged with the metallic element;

the disposable apparatus, while being attached to the nose of the wearer, being selectively transitional between an active state and an inactive state, in the active state, **the metallic element magnetically interacts with the magnet to impart the dilating force on the nose of the wearer**, in the inactive state, the metallic element is magnetically decoupled from the magnet to cease imparting of the dilating force on the nose of the wearer.

Answer, Ex. 1 (the defendant's patent) at 15 (emphasis added).  The plaintiff contends that the

Accused Product does not infringe claim 1 because the Accused Product does not practice the

bolded and underlined portions of the above quoted language of claim 1.  See Pl.'s Opp'n at 32.

The plaintiff does not dispute each paragraph separately, but instead separates its arguments into

two groups:  (1) arguments that pertain to the magnet included in claim 1[10], and (2) arguments

---

[10] This includes paragraphs 1, 3, 6, and 7 of claim 1 listed above.

that pertain to the adhesive layer in claim 1.[11]  See id. at 33–35.  In construing claim 1 and applying that construction to the Accused Product, the Court will address the disputed paragraphs in the two groups as argued by the plaintiff.[12]

As to the first group, the plaintiff argues that "[t]he [a]ccused [p]roduct does not include a 'magnetic nasal band'" and the plaintiff has "never offered for sale or sold a 'nasal band,' 'magnetic nasal band,' 'bridge member,' or other device that magnetically couples to the [a]ccused product."  Id. at 34 (quoting Second Habib Decl. ¶ 2).  The defendant correctly responds that it is "irrelevant whether [the plaintiff] has ever sold a magnetic nasal band with which its nasal adhesives are configured to be used."  Def.'s Reply at 7.  By its plain terms, the defendant argues, claim 1 provides that the "disposable apparatus" that attaches to the nose of the wearer is "configured for use with a magnet."  Answer, Ex. 1 (the defendant's patent) at 15.  The defendant further notes that the language of claim 1 does not describe the magnet itself, but merely describes what the disposable apparatus is to be "configured" with.  Id.  In other words, although the disposable apparatus is to be used with a magnet, claim 1 only describes the disposable apparatus itself and not the magnet.  The Court agrees with the defendant's construction of claim 1.  Instead of reading each sentence of claim 1 as a whole, the plaintiff is attempting to piecemeal certain portions of the sentence to fit its argument.  The Court declines to adopt the plaintiff's piecemeal interpretation.

---

[11] This includes paragraphs 2 and 4 of claim 1 listed above.

[12] As the defendant highlights, the plaintiff has "offered zero explanation as to how" paragraph 4 of claim 1 does not infringe on the defendant's patent, Def.'s Reply at 9, and the Court cannot seek to fill that void by providing what has not been included in this argument.  Therefore, because the plaintiff failed to explain or support its perfunctory argument the Court need not address it.  See Johnson v. Panetta, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[P]erfuntory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived."); Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) (explaining that it is the party's task to spell out its arguments squarely and distinctly).

It is clear by the ordinary language of claim 1, i.e., "[a] disposable apparatus attachable to a nose of a wearer and configured for use with a magnet[,]" Am. Compl., Ex. A (the defendant's patent) at 15 (emphasis added), is not language that describes the magnet, but is instead language that describes what the "disposable apparatus" is to be used with, i.e. a magnet. Id. Paragraphs 3, 6, and 7 are no different. Paragraphs 3 and 6 explicitly use the "configured to" language to describe how the metallic element in the disposable apparatus relates to the magnet element introduced in later claims of the defendant's patent. Id. And, although paragraph 7 of claim 1 does not use the same "configured to" language, it describes the disposable apparatus in its "active state" (when it is coupled with a separate magnet) versus its "inactive state" (when it is decoupled from the separate magnet). Id. Thus, the plain and ordinary language of claim 1 makes clear that the product claimed is not the magnet, but the disposable apparatus itself.

In applying that construction to the Accused Product, the plaintiff does not contend that the Accused Product has any use other than being designed for use with a magnet. This fact defeats the plaintiff's argument. See Ericsson, Inc., 773 F.3d at 1217 (explaining that when "the accused device is actually used in an infringing manner and can be so used without significant alterations[,]" the Federal Circuit's "case law supports finding infringement"). The plaintiff attempts to avoid this fact by contending that its Accused Product "is not limited to the [defendant's] breathing system[,] . . . but rather . . . may be readily used in conjunction with a variety of applicator types[,]" 2d Habib Decl. ¶ 6. However, the plaintiff has failed to provide any evidence that its Accused Product is designed to be configured with anything other than a magnet. And, specifically, included in the plaintiff's First Amended Complaint is an image of the Accused Product's application steps, which states in step 1 that a "[m]agnetic nasal band and applicator [are] not included." Am. Compl. ¶ 5; Am. Compl., Ex. B at 16 (same); see id. at 14

(including a close-up image of the Accused Product with a description underneath stating "[t]hin adhesive patch with metal disc attaches to magnetic nasal band"); id. at 15 (showing images of the Accused Product coupled with a black band attached to the Accused Product and arching over the wearers' nose); id. at 17 (same).

The Federal Circuit has held that "an accused product may be found to infringe if it is reasonably capable of satisfying the claim limitation." Versata Software, Inc. v. SAP Am., Inc., 717 F.3d 1255, 1262 (Fed. Cir. 2013) (citing Finjan, Inc. v. Secure Computing Corp., 626 F.3d 117, 1204 (Fed. Cir. 2010)) (internal citations omitted). Moreover, evidence showing that if the "user followed the accused infringer's own instructions, the system would operate in an infringing manner[,]" has been the basis for the Federal Circuit concluding that an accused product infringed a patent. Compare Ericsson, Inc., 773 F.3d at 1217 (discussing the Federal Circuit's reasoning in Versata Software, Inc., 717 F.3d at 1263); with id. at 1216 (explaining the Federal Circuit's decision in Ball Aerosol and Specialty Container, Inc. v. Limited Brands, Inc., 555 F.3d 984 (Fed. Cir. 2009), where an accused product did not infringe the patent at issue because the apparatus was never "placed in the infringing configuration"). Therefore, in construing and applying the paragraphs of claim 1 describing the magnet being configured with the disposable apparatus, the Court finds that the defendant will likely prove infringement because claim 1 describes the disposable apparatus itself and the Accused Product is designed to be used in an infringing manner.

As to the second group of arguments regarding the adhesive layer in claim 1, the plaintiff directs the Court to paragraph two of claim 1, which states that the defendant's product consists of "a flexible base layer including a first surface and an opposing second surface, the first surface having an adhesive **disposed thereon** to enable the first surface to be selectively attachable to

17

the nose of the wearer[.]" Pl.'s Opp'n at 34; see Answer, Ex. 1 at 15. The plaintiff contends that the adhesive layer in the Accused Product is not "disposed thereon[,]" but instead "[t]he adhesive **is** the layer." Pl.'s Opp'n at 33; see id. at 35 (arguing that although the Accused Product "include[s] an adhesive, [ ] there is [ ] no adhesive 'disposed thereon' with respect to the purported first surface of the adhesive itself"); Hr'g Tr. 11:21–22 (counsel for the plaintiff explaining that it is "not contesting . . . that [it] ha[s] adhesives in the [A]ccused [P]roduct"). In other words, the plaintiff contends that there is nothing to be disposed of in regards to the adhesive on the Accused Product. The defendant responds that the Accused Product does in fact have an adhesive layer which "is what makes it possible to secure [the Accused Product] . . . to a wearer's nose." Def.'s Reply at 8–9 (providing an alleged image of the Accused Product with sticky residue apparent on the layer closest to a surface).

To determine the scope and meaning of the language "disposed thereon" in claim 1, the Court is guided by the language of the specification. See Phillips, 415 F.3d at 1315 (citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (explaining that the specification "is the single best guide to the meaning of a disputed term")). The specification states that "each nasal element may be secured to the wearer's nose via an adhesive layer located on the underside of the nasal element." Am. Compl., Ex. A (the defendant's patent) at 14. In addition it states "[e]ach nasal element may be configured for a one-time use[,] and thus several nasal elements may be packaged and sold as a set." Id. The specification further states that the "base layer" of "a nasal element" "may include a peel-off liner which may be removed to expose adhesive for securing the nasal element to the user's nose." Id. And it states that "[t]he peel-off liner may include a single continuous strip or a segmented strip." Id. The Court concludes that the specification makes clear that the "disposed thereon" language of claim 1 refers to the "peel-

18

off liner" that the nasal tab is removed from, which exposes the adhesive layer so that a wearer may fasten the nasal tab to the wearer's nose.  Accordingly, the Court finds that the plaintiff's Accused Product clearly includes "an adhesive disposed thereon[,]" as the plaintiff concedes that there is an "adhesive on [the] first surface of [the] base layer" of the Accused Product.  Pl.'s Opp'n at 33–34.

Based on the foregoing analysis, the Court concludes that the defendant is likely to succeed in proving that the plaintiff is directly infringing claim 1 of its patent, and therefore is also infringing claims 2–18 of the defendant's patent.

### 2.    Whether the Defendant's Patent Is Vulnerable to a Validity Challenge

The plaintiff contends that despite the defendant's arguments that it is infringing the defendant's patent, the defendant's patent is invalid for two reasons, and therefore a preliminary injunction should not be issued.  First, the plaintiff argues that the defendant's patent is "invalid as indefinite under 35 U.S.C. § 112[,]" Pl.'s Opp'n at 35, because it is "unclear whether the [language] 'a flexible base layer' and 'the base layer' [in claim 1] is referring [to] the same layer or [ ] two separate layers," id. at 36; see Am. Compl., Ex. A (the defendant's patent) at 15.  The plaintiff challenges the clarity of this language, arguing that the terms "'the base layer' [and 'the interaction' both] lack[] [a] sufficient antecedent basis."  Pl.'s Opp'n at 36–37.[13]  The defendant responds that the terms "the base layer" and "the interaction" both have a clear antecedent basis, and that the plaintiff's argument "demonstrates a fundamental misunderstanding of the law."

---

[13] Because "[a] claim is indefinite when it contains words or phrases whose meaning is unclear[,]" Manual of Patent Examining Procedure ch. 2173.05(e) (9th ed. Rev. Nov. 2024), a claim may be found to be indefinite if it lacks an antecedent basis to a term or phrase.  For example, "where a claim refers to 'said lever' or 'the lever,' where the claim contains no earlier recitation or limitation of a lever and where it would be unclear as to what element the limitation was making reference[,]" the lack of clarity could cause the claim to be indefinite.  Id.  In applying this principle to the plaintiff's arguments, the plaintiff seems to argue that the reference to "the base layer" and "the interaction" in claim 1 are phrases that lack clear meaning and cause claim 1 to be indefinite.

Def.'s Reply at 13.  Second, the plaintiff argues that the defendant's patent is invalid as obvious "in view of the prior art[,]" namely "U.S. Patent No. 7,793,661 to Macken ('Macken') in view of U.S. Patent Publication No. 2005/0139215A1 to Riach JR. (['']Riach')."  Pl.'s Opp'n at 37.  The defendant argues that the plaintiff "fails to show obviousness where it improperly attempts to combine [the] prior art[ of Macken and Riach] [ ] but there [was] no motivation to combine these references and, even if there was, taken together they still fail to teach all the limitations of the [defendant's p]atent."  Def.'s Reply at 14.

A "patent carries with it a presumption of validity under 35 U.S.C. § 282."  Tinnus Enters., LLC, 846 F.3d at 1205.  "The burden on the accused infringer to show a substantial question of invalidity at the preliminary injunction stage is lower than what is required to prove invalidity at trial."  Altana Pharma AG v. Teva Pharm. USA, Inc., 566 F.3d 999, 1006 (Fed. Cir. 2009).  During the preliminary injunction stage of a case, "[v]ulnerability is the issue . . . , while validity is the issue at trial."  Amazon.com, Inc., 239 F.3d at 1359.  Thus, in order to preclude a preliminary injunction from being issued, the plaintiff must at least show that the defendant's patent is vulnerable to a validity challenge.  Once the plaintiff makes that showing, the defendant "must show it will likely withstand the challenges to the validity of the patent to obtain a preliminary injunction."  Natera, Inc. v. NeoGenomics Lab., Inc., 106 F.4th 1369, 1376–77 (Fed. Cir. 2024).  The Court will address the plaintiff's validity challenge arguments in turn, beginning first with indefiniteness and then addressing obviousness.

a.    **Indefiniteness**

35 U.S.C. § 112(a) requires that a "specification" in a patent

contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly

20

connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.

Therefore, "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014).  Additionally, "a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." Id. at 909 (internal brackets and quotations omitted).  At the same time, "the definiteness requirement must take into account the inherent limitations of language" and "[s]ome modicum of uncertainty . . . is the 'price of ensuring the appropriate incentives for innovation.'" Id. (quoting Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 732 (2002)); see In re Packard, 751 F.3d 1307, 1313 (Fed. Cir. 2014) (explaining that the definiteness "requirement is not a demand for unreasonable precision" and that "verbal precision" in every case is not possible "in a patent system that actually works, in practice").

Focusing on the following language, the plaintiff argues that it is "unclear whether the recited 'a flexible base layer' and 'the base layer' are referring [to] the same layer or to two separate layers." Pl.'s Opp'n at 36.

> **[A] flexible base** layer including a first surface and an opposing second surface, the first surface having an adhesive disposed thereon to enable the first surface to be selectively attachable to the nose of the wearer;
>
> a metallic element coupled to the second surface of **the base layer** and being configured to interact with the magnet when the magnet is positioned adjacent the nose of the wearer and **the flexible base layer** is attached to the nose of the wearer, **the interaction** between the metallic element and the magnet imparting a dilating force on the nose of the wearer causing the nose of the wearer to dilate[.]

Am. Compl., Ex. A (the defendant's patent) at 15 (emphasis added).  The plaintiff contends that "the interaction" in the above-quoted language lacks a sufficient antecedent basis.  Pl.'s Opp'n at

21

37.   The plaintiff cites the Federal Circuit's unpublished opinion in Tuna Processors, Inc. v. Hawaii Int'l. Seafood, Inc., 327 F. App'x. 204, 210 (Fed. Cir. 2009), to contend that "every term referring to an element of the claimed invention must first be introduced with an indefinite article such as 'a' or' an' and then subsequently must be referred to with a definite article such as 'the' or the term 'said.'"  Pl.'s Opp'n at 36.  But nowhere in the Federal Circuit's opinion does the court indicate that this drafting practice takes precedence over the plain language of the claim as a whole.  In fact, in Tuna Processors, Inc., the Federal Circuit analyzed the chronological reference of the disputed term throughout each step of the claim before explaining that "traditional claim drafting practice . . . support[ed the court's] conclusion."  327 F. App'x. at 210; cf. Slimfold Mfg. Co. v. Kinkead Indus., Inc., 810 F.2d 1113, 1116 (Fed. Cir. 1987) (explaining that an antecedent basis can be present even by implication).

When analyzing the disputed language, it is clear that each disputed term does in fact have a proper antecedent basis.  To start, "a flexible base layer" is described as including two surfaces—"a first surface and an opposing second surface."  Am. Compl., Ex. A at 15.  The first surface being the adhesive surface that attaches to the nose of the wearer.  Id.  The "second surface" of "the base layer" being the surface that has the metallic element that "interact[s]" with "the magnet."  Id.  It is therefore clear from the language itself what is claimed in the disputed paragraphs, and the Court is not persuaded by the plaintiff's flawed interpretation, since it is understood that "[i]nherent components of elements recited have antecedent basis in the recitation of the components themselves."  Manual of Patent Examining Procedure ch. 2173.05(e) (9th ed. Rev. Nov. 2024); see, e.g., Bose Corp. v. JBL, Inc., 274 F.3d 1354, 1359 (Fed. Cir. 2001) (explaining that "the limitation the outer surface of said sphere would not require an antecedent recitation that the sphere have an outer surface") (internal quotations

omitted)).  Additionally, "the failure to provide explicit antecedent basis for terms does not always render a claim indefinite."  Manual of Patent Examining Procedure ch. 2173.05(e) (9th ed. Rev. Nov. 2024).  Instead, "[i]f the scope of a claim would be reasonable ascertainable by those skilled in the art, then the claim is not indefinite."  Id.  Accordingly, the Court finds that the plaintiff's indefiniteness argument fails to support its position that the defendant's patent is vulnerable to a validity challenge.

> b.    Obviousness

The plaintiff contends that the defendant's patent is obvious in light of the Macken patent and the Riach patent application and therefore a preliminary injunction should not issue.  See generally Pl.'s Opp'n at 37–40.  The defendant responds that the plaintiff's obviousness argument fails "at least because there is no motivation to combine the [Macken patent or the Riach patent application,] Def.'s Reply at 14, but also because the Riach patent application "teaches away from the limitations of the" defendant's patent, id. at 15.  Moreover, the defendant argues that the plaintiff's obviousness argument also fails because the plaintiff has failed "to show that these two pieces of prior art in combination teach all the limitations of the" defendant's patent.  Id. at 16.

A claim is invalid for obviousness "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."  35 U.S.C. § 103(a).  "In determining whether there would have been a motivation to combine prior art references to arrive at the claimed invention, a challenger must show a reason why a skilled artisan would have made the combination."  Natera, 106 F.4th at 1376; Amazon.com, Inc., 239 F.3d at 1364 ("The relevant inquiry is what a hypothetical

ordinarily skilled artisan would have gleaned from the cited references at the time that the patent application leading to the [ ] patent was filed."). This is a question of law based on underlying factual determinations. Id.; Kinetic Concepts, Inc. v. Smith & Nephew, Inc., 688 F.3d 1342, 1360 (Fed. Cir. 2012) (same).

Before discussing the plaintiff's obviousness argument, a brief overview of the Macken patent and the Riach patent application is required. The Macken patent is described as "[a]n anti-snoring device that attaches to a specific area of the neck." Pl.'s Opp'n, Ex. 4 (Macken Patent) at 2. "The attachment means can be an adhesive, a clip or an implant." Id. The device works by "exert[ing] a predetermined pulling force on this area of the neck, causing this area of the neck to expand outward from its normal position." Id. "In the preferred embodiment [of the anti-snoring device], adhesive patches are attached to the skin to cover two responsive points along the left and right edges of the trachea." Id. at 11. "The pulling force to expand these areas is generated by a separate springy connector that pulls both patches apart with a predetermined force." Id. Specifically, claim 1 of the Macken patent describes "an adhesive skin connecting member disposed on said inside surface between said first and second ends[.]" Id. at 15. Claim 3 states, in part, "wherein said skin connecting member comprises an adhesive disposed on said inside surface of said arch[,]" and claim 4 states that the "said adhesive is a double-sided adhesive tape." Id.

The Riach patent application describes an "invention [ ] related to a magnetic nose pad apparatus for use with a non-invasive magnetic method for sinus therapy." Pl.'s Opp'n, Ex. 5 (Riach Application) at 8. The patent application explains that the sinus therapy is meant to "cause[] a reduction in blood aggregation of the blood in the nose/sinus area veins and capillaries . . . [,which is designed to] improv[e] circulation throughout the nose/sinus area as

24

non-aggregated blood is better able to transfer oxygen, antibodies and immune system agents throughout the nose/sinus area." Id. Specifically, claims 1, 5, and 6 of the Riach patent application detail a disposable adhesive strip "for sinus therapy comprising: a retaining device adapted to fit on a user[']s nose, [with] said retaining clip having at least one magnet oriented to project a magnetic north filed into the users nose and/or sinus area." Id. at 9. Additionally, according to claim 3 of the Riach Application, the nosepiece of the apparatus is comprised of "at least two magnets wherein one magnet is located on each side of the nosepiece." Id. Claim 4 states that the apparatus "is a[n] unshaped clip comprising a pair of nose pads and one pad is located on each leg of the clip and there is a magnet on each nose pad." Id.

The plaintiff notes that the United States Patent and Trademark Office (hereinafter referred to as the "Patent Office") explained in a "Detailed Action" that now-claim 1 of the defendant's patent was initially rejected by the Patent Office after the Patent Office found that the Macken patent taught claim 1 of the defendant's patent. See Pl.'s Opp'n at 37–38; 2d Watkins Decl., Ex. 6 (Office Action Summary) at 4–5. According to the plaintiff, following the rejection, the inventor of the defendant's patent amended now-claim 1 and resubmitted the application resolving the grounds for the earlier rejection by the Patent Office. 2d Watkins Decl., Ex. 7 (Response to Office Action Summary) at 3, 9. Subsequently, the Patent Office accepted the amended claims in a Notice of Allowance concluding that the Macken patent "fail[ed] to teach or render obvious the overall claim invention" described in claim 1 because

> [t]he prior art of [the] Macken [patent] teaches a metallic element [ ] that is not covered by an outer layer. Macken teaches that a metallic element with a hole and [a] spherical magnetic element. The spherical magnetic element being drawn into the hole of the metallic element with no other material between.

2d Watkins Decl., Ex. 8 (Notice of Allowance) at 7.

25

The plaintiff contends that the Riach application "provid[es] the one missing limitation that the [patent] examiner was looking for [when considering the defendant's patent application], which was an outer layer coupled to the base layer and extending over" the metallic element. Hr'g Tr. at 19:17–19; Pl.'s Opp'n at 38.  The plaintiff argues that the device described in the Riach application "helps expand the nasal passages[,]" which in turn would "help [the wearer] breathe better."  Hr'g Tr. at 16:17–22.  The defendant responds that the plaintiff has failed to "explain why a person of ordinary skill in the art would combine the[ Macken patent and the Riach application] that solve entirely different problems in entirely different ways."  Def.'s Reply at 15.  The Court agrees with the defendant.

At the outset, the Court notes that the invention described in the Riach application stimulates blood flow via "at least one magnet oriented to direct a north magnetic field towards the nose/sinus area(s)" of the wearer.  2d Watkins Decl., Ex. 5 (Riach Application) at 8.  Thus, the purpose of the magnet(s) in the device described in the Riach application is performing an entirely different function than the magnets included in the defendant's medical device, i.e., the magnets are not aiding in the expansion of the wearer's nasal passage.  But, more importantly, the Court notes that the Riach application does not include the "one missing limitation that," Hr'g Tr. at 19:17–19, was not included in the Macken patent.  Specifically, the plaintiff contends that the missing limitation in the Macken patent that would have made the defendant's patent obvious was the fact that the Macken patent did not describe "an outer layer to cover the steel disk of Macken at least partially," Pl.'s Opp'n at 40, but neither does the Riach application.  See generally 2d Watkins Decl., Ex. 5 (Riach Application).  Moreover, as the defendant notes, the magnets detailed in the Riach application are to be placed on the same side of the wearer's nose to stimulate blood flow, whereas the magnets in the defendant's medical device are placed on the

26

wearer so that the magnets interact with an additional magnetic strip.  See Def.'s Reply at 15 (arguing that "the Riach reference actually teaches away from the limitations of the" defendant's patent).

The Riach application describes that the magnet(s) in that device may be mounted "by, for example, adhering at least one magnet(s) with a suitable adhesive, molding the magnet into the nose area . . . or by the creation of a suitable hole into which the magnet(s) is/are press fit and or adhered."  2d Watkins Decl., Ex. 5 (Riach Application) at 9.  Or, if the wearer were to use a "nose clip," the nose clip could be "coupled with two nose pads . . . containing magnets."  Id. "In an alternative embodiment, the magnets may be mounted on the form of adhesive nose channel expanding devices commonly used by athletes."  Id.  These descriptions, therefore, do not describe that the magnet is covered by an outer layer as the plaintiff contends.  See Broadcom Corp. v. Int'l Trade Comm'n, 28 F. 4th 240, 251 (Fed. Cir. 2022) (affirming the United States Patent and Trademark Office Patent Trial and Appeal Board's finding of no invalidity for obviousness where cited prior art references did not teach one of the limitations of the patent-at-issue).

Additionally, the Court does not find that the plaintiff has shown that a person of ordinary skill in the art at the time of the invention would have combined the teachings of the Macken patent with the teachings of the Riach application.  This case is unlike other Federal Circuit cases where the court found that the patent-at-issue was vulnerable to a validity challenge.  For example, in Amazon.com, Inc., the court concluded that the patent-at-issue was vulnerable to a validity challenge because the prior art considered by the court similarly included a "single action ordering technology," 239 F.3d at 1360, 1365, or "a multiple-step ordering process[,]" id. at 1363, or the ability to store "purchaser data on [a] server system for subsequent retrieval

27

indexed by an identifier transmitted from the client system," id. at 1363–64, among other features that the patent-at-issue contained.  The court held that the features included in the prior art considered in that case were similar to the claims in the patent-at-issue and thus made the patent-at-issue vulnerable to a validity challenge.  Id. at 1366.  On the other hand, this case is more akin to Natera, Inc., where the Federal Circuit held that a challenger of a patent "failed to articulate a reason why a skilled artisan would have been motivated to" use a feature of a different patent to create the patent-at-issue when the challenger "put forth little more than [a] conclusory argument with no meaningful supporting documentation."  106 F.4th at 1377.  Here, besides highlighting the Macken patent—which the Patent Office already decided did not teach the defendant's patent—and including the Riach Application, the plaintiff has not explained the reason or motivation a person of ordinary skill in the art at the time of the invention would have possessed and therefore would have combined these two prior arts.  See BlephEx, LLC, 24 F.4th at 1403 (holding that an obviousness argument failed when the challenger "failed to present any evidence regarding the factual considerations underlying the obviousness inquiry, including whether a skilled artisan would have been motivated to modify the device" in the prior art).

Lastly, the plaintiff does not deny, as it must, that a patent is presumed valid, Hr'g Tr. at 15:15–16, but contends that here the Patent Office did not locate the prior art of Riach because "[t]hey don't [ ] have time to spend tens of hours searching for prior art."  Id. at 15:17–23.  The plaintiff argues that if the Patent Office had been aware of the Riach Application, the combination of the prior art in the Riach Application and the Macken patent would have made the defendant's patent "obvious to one having ordinary skill in the art at the time of the invention."  Pl.'s Opp'n at 40.  The Court is not persuaded by this argument after having reviewed the prior art itself and concluding that the Riach Application fails to include any similar

28

claims as the defendant's patent besides the use of magnets and adhesive on the nose of a wearer in totally different ways and for a wholly different purpose.

Accordingly, the Court finds that the plaintiff has not shown that the validity of the defendant's patent is vulnerable, either to an indefiniteness challenge or an obviousness challenge, and therefore, the Court finds that the defendant is likely to succeed on the merits of its patent infringement claim.

## B.    Irreparable Harm

The Court next assesses whether the defendant will suffer irreparable harm in the absence of a preliminary injunction.  According to the defendant, the plaintiff's alleged infringement "inflicts myriad forms of irreparable harm on" it, including:  (1) "erod[ing the defendant]'s reputation as an innovator and provider of highly effective, high-quality products;" (2) "erod[ing] the price for [the defendant]'s products;" (3) "turn[ing] consumers off of [the defendant]'s innovative technology by misleading them into believing that [the plaintiff]'s poor quality [ ] products reflect the value of [the defendant]'s innovation[;]" and (4) "causing [the defendant] to lose customers and goodwill."  Def.'s PI Mot. at 29.  In a brief response, the plaintiff does not seem to refute most of the alleged irreparable harms that the defendant contends it will suffer, but instead argues that the defendant "sat on its hands for" eleven months after learning that the plaintiff's product was being sold on Amazon before filing its preliminary injunction motion, and therefore, the plaintiff contends that the defendant "cannot now demonstrate irreparable harm."  Pl.'s Opp'n at 31.  Additionally, the plaintiff contends that the defendant "advance[d]" "negative product reviews" against the plaintiff's product on Amazon and should not "be permitted to load the deck with its own invective."  Id.  The Court disagrees

with the plaintiff and finds that the defendant has shown that it will suffer irreparable harm in the absence of a preliminary injunction.

In order to establish irreparable injury, a party must meet a "high standard."  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  The alleged injury "must be both certain and great," "actual and not theoretical," and "of such imminence that there is a 'clear and present' need for equitable relief."  Id. at 297–98 (quoting Wis. Gas Co. v. Fed. Energy Regul. Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  Furthermore, the alleged injury "must be beyond remediation"; in other words, the party alleging irreparable injury must establish that "[t]he possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm."  Id. at 297–98. (quoting Wis. Gas Co., 758 F.2d at 674); Sampson v. Murray, 415 U.S. 61, 90, 94 (1974) ("The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.") (quoting Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958)).  Additionally, at the preliminary injunction stage of a patent infringement case, the movant must "establish a causal nexus between the alleged infringement and the alleged harm." Natera, Inc., 106 F.4th at 1378.  For example, evidence of head-to-head competition and lost market share can support a showing of irreparable harm.  Id. (citing TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc., 920 F.3d 777, 793 (Fed. Cir. 2019)); see Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1328 (Fed. Cir. 2008) ("The essential attribute of a patent grant is that it provides a right to exclude competitors from infringing the patent") (citing 35 U.S.C. § 154(a)(1)).

At the outset, the defendant contends that the plaintiff's Accused Product directly competes with a product that "is at the core of the [defendant]'s business."  Def.'s PI Mot. at 30,

32.  The defendant argues that the plaintiff's product harms the defendant's "reputation as an innovator by creating a perception among consumers that [the defendant] is not the exclusive source of the technology in the [defendant's] [p]atent[,]" thereby "degrad[ing] [the defendant's] reputation for quality and effectiveness." Id. at 31.  The Court agrees that the record before it supports the defendant's position.  Specifically, the defendant reiterates that it does not license its patent to be sold by any other supplier. Id. at 31–32.  This is because the defendant seeks to "protect the quality of [its] products" since, according to the defendant, the quality of its products is the reason for the defendant's success. Id. at 32.  Courts have concluded that evidence that a patentee does not license its product is a factor that supports a showing of an irreparable injury experienced by the patentee in a patent infringement case. See Natera, Inc., 106 F.4th at 1379 (holding that the district court did not err in considering the patentee's unwillingness to license its patent); Presidio Components, Inc. v. Am. Technical Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012) (same).[14]

---

[14] As noted earlier, the plaintiff contends that the defendant has not demonstrated irreparable harm because the defendant "sat on its hands for" eleven months before seeking a preliminary injunction. Pl.'s Opp'n at 31.  The defendant responds that it has been "picking off hundreds of infringers at a time[,]" "all of whom are copying aspects of [the defendant's] Breathing Strips after the product went viral on social media" via Amazon's APEX program. Def.'s Reply at 17–18.  Additionally, the defendant explains that it filed an APEX complaint against the plaintiff on Amazon after becoming aware that the plaintiff had "new stock" and was allegedly selling an infringing version of the defendant's product. Id. at 19.  And, Amazon subsequently took down the plaintiff's Amazon page as a result of the defendant's APEX complaint. Id.  However, four months later, the defendant "notice[d] that [the plaintiff's] nasal adhesives [were] back on Amazon[,]" causing the defendant to "file another APEX complaint against [the plaintiff]." Id.  The defendant contends that these actions demonstrate that it "has been diligently working to stop [the plaintiff']s infringement since [it] first learned of its" Accused Product. Id. at 20.  The Court agrees and finds that the defendant has not unduly delayed its effort to enjoin the plaintiff from selling the Accused Product.  As the defendant rightfully relies on an analogous situation, the Federal Circuit has concluded that when a patentee is "involved in ongoing infringement litigation over related patents during the" period before it moves for a preliminary injunction, the court has held that the patentee did not "unreasonabl[y] delay" in bringing its patent infringement suit. See Natera, Inc., 106 F.4th at 1380 (holding that seven months delay was not unreasonable).  Other members of this court have concluded the same. See Texas Child.'s Hosp. v. Burwell, 76 F. Supp. 3d 224, 244–45 (D.D.C. 2014) (finding that the plaintiff "diligent[ly] pursued [ ] a variety of avenues" in the three years before filing its preliminary injunction motion and therefore the court declined to find that the plaintiff unreasonably delayed its motion).

31

Additionally, because the defendant holds itself out in the market as the seller of an exclusive, patented product—but the plaintiff sells the Accused Product which purportedly is the same as the product sold by the defendant—the defendant credibly contends that it is being portrayed as dishonest to consumers, thereby ruining its reputation in the market.  See Def.'s PI Mot. at 32; Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012) (affirming a district court's finding of irreparable harm when the testimony included evidence that a patentee was "precluded from marketing to potential and existing customers that it [was] the exclusive market leader").  Further, the plaintiff is allegedly selling a product of poorer quality than the defendant's product and taking potential customer sales away from the defendant, compounding the reputational and economic harm the defendant will face if the plaintiff continues to sell its Accused Product.  See Def.'s PI Mot. at 33–34; Celsis In Vitro, Inc., 664 F.3d at 930 (affirming a district court's holding that a patentee would suffer irreparable harm because of the "damage to ongoing customer relationships, loss of customer goodwill, . . . and loss of business opportunities").  Illustrating this harm, the defendant asserts that "there is already actual confusion and degradation of [the defendant]'s reputation" based on customer reviews that warn other consumers that the defendant's "spreader apparatus [i.e., the magnetic nasal strip, is] useless" because the plaintiff's Accused Product does not stay on the wearer's nose throughout the night.  Def.'s PI Mot. at 33 (citing David Decl., Ex. C (1-star Amazon Reviews for Nasal Strips Refill Pack – 30-Day Count – Enhanced Breathing, Sleep Aid & Snore Reduction, Bash Stack) at 7 (emphasis omitted); see David Decl., Ex. B (Amazon Product Page for Nasal Strips Refill Pack – 30-Day Count – Enhanced Breathing, Sleep Aid & Snore Reduction, Bash Stack )at 9 (showing a customer review of the plaintiff's product in which a customer writes that "the magnet part works well, but [the Accused Product] do[es] not stick

well to [the customer's] nose [and] comes unattached f[rom] [the] nose, thus, making the whole system not work well"); id. at 10 (listing another customer review which states that the Accused Product does not stick to the wearer's nose "especially once under a little tension from the magnet"); id. at 5 (listing customer review which states "[t]hey work with proper placement and prep but definitely not as good as the brand name which is what [I']d thought [I']d ordered"); id. at 3 (showing that Amazon listed the defendant's magnetic nasal strip in the "product videos" section of the plaintiff's Amazon page); see also 2d Habib Decl. ¶ 14 (explaining that Amazon, "without instruction by [the plaintiff,]" "added" the defendant's "product marketing video" on the Accused Product's Amazon page).[15]

Moreover, the defendant contends that its reputation is particularly sensitive at this time because the defendant is still in the early growth stage of selling its medical device. Def.'s PI Mot. at 34–35. The defendant explains that the plaintiff's "sale of its infringing nasal adhesives

---

[15] The plaintiff argues that the Court should discredit the defendant's contention that customer reviews show that the plaintiff is tarnishing the defendant's reputation because the defendant's own CEO wrote a negative review of the Accused Product on the plaintiff's Amazon page and therefore the defendant's alleged injury is a product of its own doing. See Pl.'s Opp'n at 31. To support its contention, the plaintiff cites a declaration attached to its memorandum in opposition to the defendant's motion to dismiss. See id. (citing Plaintiff's Memorandum In Opposition To Defendant's Motion to Dismiss For Lack Of Personal Jurisdiction Pursuant To Federal Rule Of Civil Procedure 12(b)(2) And Transfer Pursuant To 28 U.S.C. § 1406, Or Alternatively Defendant's Motion To Transfer Pursuant To 28 U.S.C. § 1404, Ex.2 (Declaration Of Seth A. Watkins In Support Of Plaintiff's Opposition To Defendant's Motion To Dismiss For Lack Of Personal Jurisdiction Pursuant To Federal Rule of Civil Procedure 12(b)(2) And Transfer Pursuant To 28 U.S.C. § 1406, Or Alternatively Defendant's Motion To Transfer Pursuant To 28 U.S.C. § 1404) ¶ 9, ECF No. 8-3). The Court finds the plaintiff's argument unpersuasive for two reasons. First, the defendant's CEO's negative review of the Accused Product was a negative review that directly critiqued the Accused Product. See id. The defendant's CEO's review of the Accused Product described it as: "[v]ery poor quality and not safe. . . . This is a cheap knockoff of Intake refills. The mystery adhesive is really poor quality and isn't something I'd want to put on my face. The metal is cheaply made with sharp edges that can cut you… Go get the real thing and be cautious out there." Id. This review was not a declaration against the defendant's interest, but instead was a direct negative critique of the Accused Product. Second, the plaintiff supports its argument by citing briefing that is moot in light of the plaintiff's Amended Complaint. This is so because when the plaintiff filed its Amended Complaint, the briefing regarding the defendant's motion to dismiss the plaintiff's first Complaint, including the plaintiff's opposition to the defendant's motion to dismiss, became moot. See Min. Order (Sept. 23, 2025); Barnes v. District of Columbia, 42 F. Supp. 3d 111, 117 (D.D.C. 2014) ("When a plaintiff files an amended complaint as of right within 21 days after the filing of the motion to dismiss under Rule 12(b), (e), or (f), the amended complaint becomes the operative pleading"); Johnson v. Panetta, 953 F. Supp. 2d 244, 250 (D.D.C.2013) (amended complaint timely filed by Court-ordered deadline rendered defendant's motion to dismiss moot).

33

began . . . just as [the defendant] went viral on social media and marketplace recognition was affording [the defendant] the opportunity to recoup its development costs and build a broad base of consumers." Id. at 35 (citing Herbert Decl. ¶¶ 7–8). The defendant argues that once it losses its good reputation in the market, money damages would not be able to cure its harm. Id. at 35–36. This is yet another factor which supports a finding that the defendant will face irreparable harm in the absence of a preliminary injunction. See Celsis In Vitro, Inc., 664 F.3d at 931 (affirming a finding of irreparable harm when the patentee was in "the growth stage of a product" because "it is particularly crucial to be able to distinguish oneself from competitors" during that stage which "includes building the brand, expanding the customer base, and establishing one's reputation and leadership in the market.").

Lastly, the defendant argues that the plaintiff is "actively eroding [the defendant's] price[]" for its refill tabs the longer "the infringing product remains on the market." Def.'s PI Mot. at 34. This is because the defendant offers customers who have opted-in to receive scheduled, ongoing, purchases of its refill tabs, i.e., subscribers of the defendant's refill tabs, a discounted price of $24.99 from the initial purchasing price of $32.99. See id. at 35; see David Decl., Ex. A (Intake Breathing Technology, www.intakebreathing.com (Sept. 16, 2025)) at 7. Meanwhile, the plaintiff's Accused Product is regularly priced at $24.99—therefore offering a "nearly 25% lower price than the price" the defendant charges for the same product without a subscription. Def.'s PI Mot. at 35. The defendant explains that it is irreparably harmed by the plaintiffs pricing structure because its "subscription model allows [it] to build a large base of return customers and provides [it] with a steady source of sales, which is jeopardized by [the plaintiff's] infringement." Id. at 35–36. Therefore, according to the defendant, the plaintiff is "eroding the marketplace rate for [the defendant]'s technology" and potentially taking "hundreds

34

of sales per customer from" the defendant.  Id. at 36.  Additionally, the defendant contends that

the plaintiff is "bring[ing] down consumer[s'] expectations for what the technology should cost."

Id.  The Court finds that this evidence shows that the defendant's product is suffering from price

erosion due to the Accused Product's pricing scheme.  See Celsis In Vitro, Inc., 664 F.3d at 930

(affirming a finding of irreparable harm when the patentee "had a general no-discount policy to

maintain its premium product pricing that it was forced to break in order to compete with" the

infringer).

For all of the foregoing reasons, the Court finds that the factors asserted by the

defendant—direct competition, reputational harm, loss of goodwill, and price erosion—

demonstrate that it will suffer irreparable harm if a preliminary injunction is not issued.  See

Natera, Inc., 106 F.4th at 1379 (holding that lost business partnerships, relationships,

opportunities, and market share are factors that supported the finding of irreparable harm); Celsis

In Vitro, Inc., 664 F.3d at 930 ("Price erosion, loss of goodwill, damage to reputation, and loss of

business opportunities are all valid grounds for finding irreparable harm.").

## C.    The Balance of Equities

Having concluded that the defendant is likely to succeed on the merits and that it will

face irreparable harm in the absence of a preliminary injunction, the third factor the Court must

assess in deciding whether to issue a preliminary injunction is determining whether the balance

of equities counsels in favor of the request.  See Winter, 555 U.S. at 20.  The defendant argues

that "[b]ecause [its] main business is selling its patented product, the balance of the equities

favors the patentee, especially because any losses alleged by the infringer upon a preliminary

injunction would also be incurred by the patentee absent a preliminary injunction."  Def.'s PI

Mot. at 37 (emphasis omitted).  The plaintiff responds, arguing that the balance of equities do not

favor the issuance of a preliminary injunction because it "would be unable to sell its Accused Product, and it would suffer losses despite it being unlikely that it infringes the patent-in-suit." Pl.'s Opp'n at 41. The Court disagrees with the plaintiff and finds that the balance of equities clearly favors the issuance of a preliminary injunction, especially because the Court has concluded that the plaintiff is likely infringing the defendant's patent and causing the defendant irreparable harm.

Importantly, the defendant holds a patent in the nasal adhesive product that it sells, unlike the plaintiff who does not hold a patent in the Accused Product. Thus, any alleged harm the plaintiff may experience from being enjoined from selling, importing, or using the Accused Product will also, if not even to a greater degree, be experienced by the defendant. As the Federal Circuit explained in Celsis In Vitro, any alleged harm by an accused infringer is "of lesser scope than the harm to the [patentee] and also protectable by a bond." 664 F.3d at 931. Accordingly, as described below, the Court can order, pursuant to Federal Rule of Civil Procedure 65(c), that the defendant post security for any "costs and damages sustained by" the plaintiff in the event that it is ultimately determined that it was wrongfully enjoined from selling, importing, or using its Accused Product. Moreover, any alleged losses the plaintiff may experience during the existence of the injunction is a result of the plaintiff's "own calculated risk in selling a product with knowledge of [the defendant's] patent." Celsis In Vitro, Inc., 664 F.3d at 931. For these reasons, the Court concludes that the balance of equities favors the issuance of a preliminary injunction.

**D.    The Public Interest**

The final preliminary injunction factor that the Court must consider is whether a preliminary injunction would be in the public interest. See Trebro Mfg., Inc., 748 F.3d at 1171

(citing Winter, 555 U.S. at 20).  The defendant argues that granting it a preliminary injunction would be in the public interest because "the public has an 'interest in the judicial protection of property rights in inventive technology'" and that interest "outweighs any interest the public has in purchasing cheaper infringing products."  Def.'s Reply at 23 (quoting Douglas Dynamics, LLC v. Buyers Prods. Co., 717 F.3d 1336, 1346 (Fed. Cir. 2013)); Def.'s PI Mot. at 39. Additionally, the defendant argues that the plaintiff's "infringement is actively harming consumers by misleading them into buying [the Accused Product] that does not work."  Def.'s PI Mot. at 38.  Moreover, according to the defendant, the plaintiff's infringement "is likely to cause confusion and deceive consumers" because the plaintiff "mak[es] misleading references to [the defendant's] own product" in the plaintiff's marketing, despite the fact that the plaintiff does not sell the defendant's product.  Id. at 39.  And, the plaintiff does not refute most of these specific arguments made by the defendant.  Instead, the plaintiff simply argues that "this case involves a private dispute" and so "[t]here is no compelling need . . . for an extraordinary remedy [such as] a preliminary injunction."  Pl.'s Opp'n at 41.  The plaintiff's position is unpersuasive.

The Court finds that the public interest favors the issuance of a preliminary injunction, largely because the public has an interest in securing a patentee's right to protect its invention through the exclusion of other competitors.  See Celsis In Vitro, Inc., 664 F.3d at 931–32 (explaining that the public interest is served when a patentee's investment, research, and development is "encouraged and protected by the exclusionary rights conveyed in valid patents").  As the defendant notes, this is a bedrock principle of patent law.  See Def.'s Reply at 23–24; see Shaw v. Cooper, 32 U.S. 292, 318 (1833) ("The policy of granting exclusive privileges in certain cases, was deemed of so much importance in a national point of view, that power was given to congress in the federal constitution.").  Therefore, contrary to the plaintiff's

contention, matters involving patent law are not "private dispute[s,]" Pl.'s Opp'n at 41, in which

the courts need not involve themselves.  Instead, "patent law was designed for the public

benefit," Copper, 32 U.S. at 320, which, in exchange for "the profits arising from the sale of the

thing invented[,]" the public receives "the exercise of [the] genius and skill [of the inventor] in

making discoveries which may be useful to society."  Id.  Accordingly, the public interest clearly

weighs in favor of issuing the preliminary injunction requested by the defendant.[16]

## E.    Security

The last matter the Court must address is the amount, if any, the defendant should be

required to post as security "to pay the costs and damages sustained by" the plaintiff if it is later

found to "have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  This issue has not been

briefed by either party, so the Court will allow the parties to submit supplemental briefing

regarding the appropriate amount, if any, the defendant should be ordered to post as security

---

[16] The Court appreciates the plaintiff's concern about compliance with the District's Local Civil Rules and this Court's General Order, but for several reasons, the Court will not deny the issuance of the preliminary injunction in this case based on the plaintiff's argument that the defendant allegedly failed to confer with it before filing its motion for a preliminary injunction.  See Pl.'s Opp'n at 21.  First, the Court has concluded that each Winter preliminary injunction factor weighs in favor of the issuance of a preliminary injunction in this case.  Second, the plaintiff's declaration represents that the defendant notified the plaintiff on September 8, 2025, that the defendant intended to file a motion for a preliminary injunction and asked whether the plaintiff had "any room" to settle "in lieu of that."  Pl.'s Opp'n at 20–21 (citing 2d Watkins Decl. ¶ 4).  Then again on the afternoon before the defendant filed its motion for a preliminary injunction, counsel for the defendant emailed counsel for the plaintiff and alerted plaintiff's counsel that the defendant intended to file a motion for preliminary injunction if the plaintiff did not "agree to immediately cease offering for sale [the Accused Product]."  Id. at 21 (citing 2d Watkins Decl. ¶ 6).  Counsel for the plaintiff contends that he "was neither in the office nor working on the afternoon or evening of Friday, September 19, 2025."  Id.  Despite the plaintiff's counsel's representations, the Court finds that the defendant did in fact alert the plaintiff that it intended to file a motion for preliminary injunction if the plaintiff did not "agree to immediately cease offering for sale [the Accused Product,]" Id. at 21, at least eleven days before the defendant filed its motion.  Third, at the outset of this dispute between the parties, after Amazon sent the plaintiff the email alerting the plaintiff that the defendant accused it of infringing the defendant's patent, the parties engaged in discussions on three different days regarding the "infringement allegation made to Amazon[]."  Am. Compl. ¶ 8.  At the culmination of those discussions, on about July 23, 2025, the defendant "declined to retract the infringement allegation it made to Amazon[] concerning the Accused Product . . . and [ ] declined any resolution other than the cessation of sales of the Accused Product by" the plaintiff.  Id.  Finally, the plaintiff has not indicated that it intends to cease offering for sale or importing its Accused Product in the event that the defendant agreed to withdraw its motion for preliminary injunction.  For these reasons, the Court is not persuaded by the plaintiff's argument that the defendant did not essentially comply with Local Civil Rule 7(m) and the Court's General Order before filing its motion for a preliminary injunction, as the objective of both were satisfied.

38

before the Court makes that determination.  See Sanofi–Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1386 (Fed. Cir. 2006) ("The amount of a bond is a determination that rests within the sound discretion of a trial court.").

### IV.    CONCLUSION

Because the defendant has not only shown that it is likely to succeed on the merits, but has also shown that it is likely to suffer irreparable harm in the absence of a preliminary injunction, and that the balance of equities and the public interest favor the issuance of a preliminary injunction, the Court enjoins the plaintiff from offering for sale, selling, importing, and/or using the Accused Product during the pendency of this litigation, unless otherwise ordered by the Court.

**SO ORDERED** this 27th day of April, 2026.[17]

REGGIE B. WALTON
United States District Judge

---

[17] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.